## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| |
|---|
| SLAINTE INVESTMENTS LIMITED PARTNERSHIP, |
| Plaintiff, |
| v. |
| JOHN B. JEFFREY a/k/a TUCKER JEFFREY, |
| Defendant. |

3:14-cv-01750 (CSH)

## RULING ON MOTION TO DISMISS

HAIGHT, Senior District Judge:

Plaintiff Slainte Investments Limited Partnership ("Slainte Investments" or "Slainte") a Texas limited partnership investing funds on behalf of its founder and manager Douglas Mueller, brings this diversity action to recover damages in connection with $719,500 it invested with Defendant John B. Jeffrey between April 24, 2008 and December 2011. Plaintiff's claims all arise under a common theme: Defendant fraudulently induced its investments through an elaborate "pyramid scheme" in which he diverted investors' funds for his personal use to fund a lavish lifestyle.

Defendant moved to dismiss the entirety of Plaintiff's amended complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing that most of the claims are barred by the applicable statute of limitations (or repose), and that certain claims are otherwise inadequately pled to state a claim upon which relief can be granted. Doc. 26. Plaintiff has filed an opposition [Doc. 31], and Defendant has elected not to file a reply. This Ruling resolves the Motion.

## I.    Background

The following facts are derived from Plaintiff's Amended Complaint [Doc. 17], and are

accepted as true solely for the purposes of resolution of the instant motion.

At some point prior to 2008, Mueller became socially acquainted with Jeffrey through mutual friends in New Canaan, Connecticut.  Am. Compl. [Doc. 17], ¶5.  Jeffrey was the founder and Chief Executive Officer of Industrial Shipping Enterprises Management Co., LLC—a shipping company that Jeffrey registered as a foreign LLC doing business in Stamford, Connecticut—and "gave the appearance of being a successful businessman." *Id.* ¶¶5, 53.  In conversations with Mueller, Jeffrey represented that he "had a successful career in the business of owning and managing a fleet of ships and shipping contracts for cargo carriers internationally." *Id.* ¶5.  Jeffrey "had been involved for at least the last ten years in the trade or business of national and international shipping of goods via ocean going vessels." *Id.* ¶53.

However, by 2008 the situation was not as favorable as Jeffrey portrayed.  "Jeffrey had sold most of the ships that comprised the fleet of Industrial Shipping" in 2005, and, by 2008, Jeffrey actually "had no source of income" and was in "dire financial straits." *Id.* ¶6.

Notwithstanding these reversals, Jeffrey "continued to maintain the presence around New Canaan and Stamford of being a successful business man [*sic*]." *Id.* ¶6.  To continue to finance his lavish tastes, Jeffrey concocted the "elaborate but fraudulent scheme" that is at the center of the instant litigation.  *Id.*  His plan was to solicit investments from his friends and neighbors that he would purport to use to "purchase ships and/or shipping contracts" for the benefit of the investors, but that he would actually use to fund his expensive lifestyle. *Id.*  To do so, Jeffrey claimed to have established two entities for which he sought investments:  Anchor Shipping & Trading LLC ("AS&T") and Southern Cross Shipping Inc. ("Southern Cross").  AS&T was to be an LLC registered in the Marshall Islands whose business was "the operation of 'conbulkers' (i.e., cargo ships

-2-

capable of handling both containerized cargo and bulk cargo) to take advantage of the spread between voyage charter business and time charter business." *Id.* ¶¶7, 9. Southern Cross was also purported to be a Marshall Islands LLC, and was set up, at least in part, to make "use [of] a deep water port in the Southeast United States." *Id.* ¶¶ 22-23. In reality, these entities either never existed or were dissolved, but, in either case, were doing "no legitimate business." *Id.* ¶¶11, 26 ("In actuality, neither company existed outside of the misleading documents Jeffrey gave the investors and in reality both were the alter ego of John Jeffrey").

Initially, Jeffrey solicited investments through in person meetings and over the phone, and, "in or around 2008," began to specifically target Mueller. *Id.* ¶7. Apparently intrigued by the opportunity Jeffrey presented but unsatisfied by his oral presentations, Mueller requested written materials further describing the investment opportunity and its potential return. *Id.* "At some point in 2008," Jeffrey provided Mueller a private placement memorandum ("PPM"), dated March 19, 2008, prepared by Jeffrey in relation to AS&T. *Id.* The PPM identified Jeffrey as AS&T's Managing Director and described the company's business function—the operation of "conbulkers." *Id.* ¶¶8, 9. At some point shortly thereafter, Jeffrey sent Mueller a "Stock Purchase Agreement" dated April 2008 ("SPA"), which asserted that "AS&T was duly organized, validly existing and in good standing under the laws of the Marshall Islands.[1]" *Id.* ¶11.

Unbeknownst to Mueller at the time, the representations in the PPM and SPA regarding AS&T were all false, and the documents were created to conceal Jeffrey's fraudulent scheme. *Id.* ¶12. For example, Jeffrey chose the name "Anchor Shipping and Trading LLC" because it closely

---

[1] Plaintiff alleges that "the Marshall Islands do not permit public access to its information," and so "there was no way to confirm the legitimacy of this representation." *Id.* ¶11.

resembled a similarly-named legitimate business, and he named as "Participants" in AS&T four managers from that similarly-named company who had no connection to or knowledge of AS&T. *Id.* ¶13.  This was done to shield Jeffrey's fraud from due diligence efforts of the investors he was deceiving. *Id.*

"Based upon [Jeffrey's] initial verbal representations and the information contained in the [PPM], [SPA] and on the information Jeffrey transmitted to him personally," Mueller directed Slainte Investments to make its first investment of $150,000 in AS&T on April 24, 2008.  *Id.* ¶15. Rather than invest any of this money, however, Jeffrey appropriated it all for his personal use, including making payments on his home mortgage and paying " for club memberships, school tuition and other family expenses."  *Id.* ¶16.

A year later, Jeffrey required additional funds to cover his personal expenses and set out to fraudulently obtain more funds from his "investors."  *Id.* ¶18.  On May 10, 2009, he drafted a letter claiming that AS&T had made $1,800,000 in profits and that the investors' shares were being reinvested.  *Id.*  In actuality, however, the company had not made any profits.  *Id.*  "These new misstatements of fact were made not only to defraud and mislead Slainte Investments and other investors into giving [Jeffrey] even more money but to assure through additional acts of frauds that he concealed the fact that the original investment was now appropriated to the defendant's ongoing criminal enterprise."  *Id.*

Around this same time, in May 2009, Jeffrey began soliciting Mueller to invest in his other company, Southern Cross, which involved a "pattern of deceptions and structure of . . . investment [that] mirrored that of AS&T."  *Id.*  ¶22.  Jeffrey prepared a Stock Purchase Agreement and Stockholders Agreement, which contained similarly misrepresented information as the PPM and

SPA for AS&T.  *Id.* ¶23.  "Based upon the documents that Jeffrey had presented, the May 10 letter announcing $1.8 million in profits in AS&T and the verbal information Jeffrey provided previously," Slainte Investments made its first investment in Southern Cross of $200,000 on May 11, 2009.  *Id.* ¶24.  This money was similarly diverted to Jeffrey's personal use.  *Id.*  Slainte invested another $40,000 in Southern Cross on June 19, 2009.  *Id.*  Sometime in the fall of 2009, Slainte Investments then invested another $119,500 in AS&T.  *Id.* ¶20.  The following year, Jeffrey solicited more funds from Slainte Investments, which made its third and final investment into Southern Cross of $110,000 on June 14, 2010.  *Id.* ¶25.  Finally, in December 2011, Jeffrey again contacted Mueller, and solicited a $100,000 investment into AS&T, the third and final investment into that entity, and the last investment with Jeffrey.  *Id.* ¶21.

In total, Plaintiff made six investments with Jeffrey between April 24, 2008 and December 2011, amounting to $719,500 ($369,500 in AS&T, and $350,00 in Southern Cross[2]).  Plaintiff's investments with Jeffrey are identified in the table below:

| Date of Investment | Amount of Investment | Entity Invested In |
|---|---|---|
| April 24, 2008 | $150,000 | AS&T |
| May 11, 2009 | $200,000 | Southern Cross |
| June 19, 2009 | $40,000 | Southern Cross |
| Fall 2009 | $119,500 | AS&T |
| June 14, 2010 | $110,000 | Southern Cross |
| December 2011 | $100,000 | AS&T |

[2]  At paragraph 25 of the Amended Complaint, Plaintiff states that its total investments in Southern Cross was $340,000.  This appears to be a mistake.  Plaintiff alleges three investments in Southern Cross—of $200,000, $40,000, and $110,000—which totals to $350,000.  Using this figure along with its alleged investments in AS&T of $369,500, gets to the total figure that Plaintiff alleges, $719,500.  *Id.* ¶26.

While Plaintiff's money was invested with Jeffrey, Jeffrey "concealed the fraudulent nature of the investment by telling further lies." *Id.* ¶33.  Between 2009 and 2013, "Mr. Mueller regularly communicated with Jeffrey in phone and in person and each time Jeffrey assured Mr. Mueller that his investments were safe and profitable." *Id.* ¶19.  In fact,

> [d]uring the period between the initial investment in 2008 and Slainte's final investment in December 2011, Jeffrey concealed the true circumstances, which was that the money was being used for Jeffrey's personal expenses and not for investment purposes, by various means, including but not limited to written documents such as private placement memoranda and subscription agreements that were completely untrue but intended to create a false sense that the investments were legitimate for purposes of concealing the fraud; verbal and written reports that the investments were not only being used for their intended purposes but that they were generating a profit and promises that investors would soon see a return on their investments also for purposes of concealing the fraud.  Even after Slainte's final investment in 2011, Mr. Mueller regularly communicated with Jeffrey either by phone or in person and each time Jeffrey assured Mr. Mueller that his investments were safe and profitable.

*Id.* ¶27.  Throughout this time, Jeffrey told Mueller "that there were many ships at anchor and mothballed in 2008 which could be bought for a reduced price and put into commerce to produce revenue for the investors." *Id.* ¶15.  "In [Jeffrey's] statements after he received money from investors, he misled investors into believing that he had invested the funds he had raised in ships and shipping contracts consistent with his statements in 2008." *Id.*  Rather, "[t]hese moneys were progressively converted to Mr. Jeffrey's personal use at various times beginning in 2008 and ending in 2013." *Id.* ¶16; *see also id.* ¶20 ("the money was ultimately misappropriated at some later date to be determined through discovery, and used to fund John Jeffrey's extravagant lifestyle").

Jeffrey's assurances to Mueller during this time "were intentionally made to further conceal the original fraud and to delay the filing of a complaint." *Id.* ¶19; *see also id.* ¶35 (Jeffrey "further intended that his continued false statements to Mueller and the other investors from 2009 through 2014, would prevent them from inquiring further and discovering the fraud or the enterprise which had facilitated the fraud.").

The "fraudulent enterprise [was] based upon initial misrepresentations that either Jeffrey knew at the time were not true or which quickly were rendered untrue by Jeffrey's decision to convert all of the money raised for the purposes of AS&T and Southern Cross to his personal benefit." *Id.* ¶27. Not only did Jeffrey knowingly make the false representations to induce Mueller's reliance thereon, he "also took advantage of a special relationship of trust and confidence of a personal friend because he thought it would be more likely that Mueller would rely on the false statements and not examine them minutely as he would a person with whom he had no personal relationship." *Id.* ¶28.

At some point in 2012—more than three and a half years following his initial investment and after having never received a payout—Mueller began to question Jeffrey on when he could expect a return. *Id.* ¶29. Jeffrey assured him that "the two companies would be making some kind of distribution in the near future, though Jeffrey declined to say when." *Id.* In one instance, Jeffrey indicated to Mueller that certain of his invested funds could not be removed "since there were other investors involved." *Id.* ¶30. Jeffrey also advised that Mueller would be unwise to sell his shares because the project for which his funds were invested "would be so successful." *Id.* Mueller was "[r]eassured by these statements," and "took no action but waited for further information from Jeffrey as to the expected distribution." *Id.* ¶31.

In late 2013, Jeffrey's "next door neighbor and investor discovered the fraud," and "Jeffrey

promptly paid him off in exchange for an agreement not to share the information with anyone." *Id.* ¶33. "Soon after, Jeffrey and his family moved to Denver to avoid further inquiries." *Id.* Although Jeffrey told Mueller in 2014 that he was in Denver "'on business,'" he was actually "unemployed and living there to avoid his investors." *Id.*

Jeffrey made no distributions to Mueller into 2014, "and  Mueller began to press Jeffrey for a strategy and a date for return of his investment." *Id.* ¶31. "Jeffrey was at all times agreeable to doing so, but . . . always had an excuse . . . or would stall." *Id.* ¶31. "When Jeffrey answered his cell phone he would state that he was 'in a meeting' or had 'just boarded a plane' and that he could not talk.  In reality, Jeffrey had no business to do and nowhere to fly to on business and was offering these false explanations in an attempt to divert Mr. Mueller from discovering Jeffrey's fraudulent conduct." *Id.* ¶33.  Nevertheless, "[b]ecause Jeffrey was agreeable to repaying the money, Mueller was lulled into a false sense of security and believed that there were real investments which could be liquidated and repaid with a profit." *Id.* ¶31.

Sometime in the middle of 2014, Jeffrey claimed that Mueller's funds were "tied up in various transactions," but that "he was about to close a deal in Western Canada that would generate funds to pay off investors." *Id.* ¶32.  Apparently fed up, "[i]n the fall of 2014, Mr. Mueller demanded that some money be returned as soon as possible." *Id.*  In response, Jeffrey indicated that $250,000 was being wired to Slainte Investments and "further agreed to a repayment schedule for the return of the remainder of the funds invested."[3] *Id.*  In reality, Jeffrey never returned any of the

---

[3]  Plaintiff characterizes this repayment agreement slightly differently later in the complaint.  In paragraph 46, it alleges that "Jeffrey assured Mr. Mueller that $250,000 had been wired to Slainte and further promised to repay the remainder of Slainte's investments pursuant to a repayment schedule within a matter of weeks *if Slainte Investments would sign some type of settlement agreement that his lawyers would provide*." (emphasis added).

funds as promised.  *Id.*

In October 2014, Jeffrey's scheme was finally revealed to Mueller for the first time when he received a call from an FBI agent who "explained that Jeffrey's two ventures were a complete fraud that had victimized a number of investors such as Plaintiff." *Id.* ¶37.  Mueller contacted Jeffrey, who denied the allegations and "promised that he would repay Slainte all of its investment within a matter of weeks." *Id.*  "After Jeffrey failed to live up to this promise, Slainte Investments filed this action" on November 21, 2014.  *Id.*

Plaintiff filed the Amended Complaint on February 10, 2015, which alleges claims for: Fraud; Civil Theft; Breach of Contract; Violation of the Connecticut Unfair Trade Practices Act ("CUTPA," C.G.S. §§ 42-110, *et seq.*); Violation of the Connecticut Uniform Securities Act ("CUSA," C.G.S. §§ 36b-4 and 36b-20); Conversion; and Unjust Enrichment.

## II.    Standard of Review

The Supreme Court has laid down in two cases guidelines to determine whether the factual allegations of a complaint are sufficient in content and form to survive a motion to dismiss.  Those cases are *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ("*Twombly*") and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ("*Iqbal*").

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Iqbal*, 566 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  This pleading standard creates a "two-pronged approach," *Iqbal*, 556 U.S. at 679, based on "[t]wo working principles, " *id*. at 678.

First, although a complaint need not include detailed factual allegations, it must provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678.

"A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id*. (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"*Id.* (quoting *Twombly*, 550 U.S. at 557. "Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Id*. (quoting *Twombly*, 550 U.S. at 555. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id*. at 679.

Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. This "'facial plausibility" prong requires the plaintiff to plead facts "allow[ing] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678. Importantly, the complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Id*. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed.R.Civ.P. 8(a)(2)). "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*.

This summary of the *Twombly/Iqbal* pleading standards is adopted from the Second Circuit's opinion in *Pension Benefit Guaranty Corp. ex rel. Saint Vincent Catholic Medical Centers Retirement Plan v. Morgan Stanley Investment Management Inc.*, 712 F.3d 705, 717-718 (2d Cir. 2013).

### III.      Whether Plaintiff's Claims are Adequately Pled

Defendant moves to dismiss the following claims on the basis that they are inadequately pled on their merits and are therefore subject to dismissal under Rule 12(b)(6): Count III (Breach of Contract); Count IV (Violation of CUTPA); Count VI (Conversion); and Count VII (Unjust Enrichment). The Court address these in turn.

#### A.      Count III (Breach of Contract)

In Connecticut, the "elements of a breach of contract claim are the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages." *Meyers v. Livingston, Adler, Pulda, Meiklejohn and Kelly, P.C.*, 311 Conn. 282, 291 (2014). "In order to form a valid and binding contract in Connecticut, there must be a mutual understanding of the terms that are definite and certain between the parties." *Joseph General Contracting, Inc. v. Couto*, 317 Conn. 565, 578 (2015) (internal quotation marks omitted). Moreover, "'[u]nder the law of contract, a promise is generally not enforceable unless it is supported by consideration.'" *Thibodeau v. Am. Baptist Churches of Conn.*, 120 Con.App. 666, 676 (Conn.App. 2010) (*quoting* Restatement (Second) of Contracts § 90)). "The existence of a contract is a question of fact to be determined by the trier on the basis of all of the evidence." *Fortier v. Newington Grp., Inc.*, 30 Conn.App. 505, 509 (Conn.App. 1993); *see also Augeri v. C.F. Wooding Co.*, 173 Conn. 426, 431 (1977) (whether a contract is "too indefinite to be unenforceable . . . [is] a question for the trier of fact").

Plaintiff brings a breach of contract claim in connection with two categories of alleged agreements. First, it alleges that Jeffrey's "original oral and written solicitations" in which he "solicit[ed] funds individually and represent[ed] that the funds would be used for certain specific purposes, [constitute] a personal contract which required [Jeffrey] to fulfill the promises he made

in soliciting the money."  Doc. 17, ¶¶45, 47.  Second, Plaintiff alleges that Jeffrey's October 2014 promise to repay Mueller constituted a contract that was breached by Jeffrey (the "Repayment Agreement").

### 1.      Oral and Written Solicitations

Plaintiff argues that Jeffrey's oral and written solicitations of Plaintiff's investments created contractual obligations that were breached when Jeffrey diverted those funds for unauthorized uses. Specifically, Plaintiff argues that its promises to provide funds to Defendant were made in exchange for Defendant's promises to use those funds to advance the specific interests of AS&T or Southern Cross.  Plaintiff alleges that Defendant breached those promises when he used those funds for personal expenses and that therefore it incurred damages.  Despite Defendant's argument that these are "[m]ere conclusory allegations without factual support," Br. [Doc. 26-1], at 7,  Plaintiff has thereby alleged each element of a breach of contract claim under Connecticut law.  Therefore, at this stage, keeping mind that it "is well settled that the existence of a contract is a question of fact," *Fortier*, 30 Conn.App. at 509, including whether it's "too indefinite to be enforceable," *Augeri*, 173 Conn. at 431, the Court holds that Plaintiff has sufficiently alleged a contractual relationship between itself and the Defendant with respect to the oral and written agreements surrounding Plaintiff's investments.

The Court comes to this holding in light of its limited role at the pleading stage, and notes that Plaintiff will ultimately have to establish the existence of these contractual obligations.  This will include an identification of the contractual agreements Plaintiff purports to sue upon, as well as the specific provisions within those agreements that it purports were in breach.  *See Joseph General Contracting, Inc.* 317 Conn. at 578; *see also Schifano v. Bank of N.Y. Co.*, 2013 WL

1715731, at *10 (Conn.Super. Apr. 1, 2013) (striking a breach of contract claim because "the plaintiff failed to specifically identify which provisions of the contracts the defendants breached"). While an investor may bring a breach of contract claim against the entity with which it invests when that investor diverts invested funds for personal use, the investor will generally identify a contractual provision that was in fact breached by the diversion. *See, e.g., Utzler v. Braca*, 115 Conn.App. 261, 274 (Conn.App. 2009) (affirming a breach of contract judgment where defendant's diversion of funds "violated paragraph fifteen of the contract restricting the use of the plaintiff's funds to Moss Ledge," and "also violated paragraph fourteen of the contract guaranteeing the plaintiff that his investment would be repaid"); *c.f. Kelly v. Yale Univ.*, 2003 WL 1563424, at *5 (D. Conn. Mar. 26, 2003) (Plaintiff's "allegations in her complaint are purely conclusory and do not even identify the contract term [Defendant] allegedly breached").

Accordingly, Plaintiff has pled allegations that constitute a breach of contract claim as to Defendant's written and oral solicitations of its investments. Defendant's motion to dismiss as to these claims is denied.[4]

### 2.    Repayment Agreement

Plaintiff alleges that in October 2014, Jeffrey promised to repay Mueller all of his and Slainte's investments within a matter of weeks, which Jeffrey did not do. Plaintiff claims that this suffices to maintain an independent claim for breach of contract against Jeffrey. However, Plaintiff's breach of contract claim with respect to the Repayment Agreement fails for a simple reason:

---

[4]  Defendant also states, without explanation, that Plaintiff's contract claims are inadequately pled because Plaintiff failed to provide allegations sufficient to determine if the statute of frauds was met. Br. [Doc. 26-1], at 8. Defendant provides no support for this argument, nor is any apparent.

Plaintiff does not allege that the parties ever fully finalized the agreement.[5]   At paragraph 46 of the

Amended Complaint, Plaintiff describes the Repayment Agreement as such:

> In or around October 2014, after Mr. Mueller was contacted by an
> FBI agent informing him of Jeffrey's fraud, he confronted Jeffrey
> about Plaintiff's investment.   Jeffrey assured Mr. Mueller that
> $250,000 had been wired to Slainte and further promised to repay the
> remainder of Slainte's investments pursuant to a repayment schedule
> within a matter of weeks *if Slainte Investments would sign some type*
> *of settlement agreement that his lawyers would provide* (the
> "Repayment Agreement") (emphasis added).[6]

The emphasized language is fatal to Plaintiff's breach of contract claim as alleged because

Plaintiff does not thereafter allege that the condition Jeffrey placed on his offer—Slainte Investment's

execution of a settlement agreement—was ever satisfied.  *See Booth v. Booth & Bayliss Commercial*

*Sch.*, 120 Conn. 221, 281 (1935) ("a ruling that [an agreement to pay a debt] is a conditional promise

. . . renders it incumbent upon the creditor to prove that the condition has been fulfilled").   As

Defendant argues, "[t]here is no allegation that a settlement agreement was signed." Br. [Doc. 26-1],

at 8.  Plaintiff offers no response to this argument in its opposition brief, other than to say that it

"never received any proposed settlement agreement" from Defendant.  Opp. [Doc. 31], at 15-16.  If

true, this is nothing more than an admission by Plaintiff that the condition Defendant placed on his

promise was not satisfied.  Plaintiff's contract claim as to the Repayment Agreement is dismissed.

---

[5]  The Court notes that the Repayment Agreement would not fail for want of
consideration.  It has long been held in Connecticut that "[n]egotiable paper taken in payment of
an antecedent debt is taken for a valuable consideration."  *Rockville Nat'l Bank v. Citizens'*
*Gaslight Co.*, 45 A. 361, 363 (1900) (*citing Brush v. Scribner*, 11 Conn. 388, 392 (1836)).  This
rule has been codified in Connecticut's adoption of the Uniform Commercial Code, at Section
42a-3-303(a)(3) of the Connecticut General Statutes.

[6]  Plaintiff reasserts the emphasized language again in opposition to the instant motion.
Opp. [Doc. 31], at 15 (Jeffrey "further agreed to repay the remainder of the funds invested *if*
*Plaintiff would sign a settlement agreement to be provided by Defendant's lawyer*" (emphasis
added)).

### B.      Count IV (Violation of CUTPA)

Defendant argues that Plaintiff's CUTPA claim is barred because "CUTPA does not apply to deceptive practices in the purchase and sale of securities." Br. [Doc. 26-1], at 9 (internal quotation marks omitted). Plaintiff does not dispute this principle; rather, it contends the principle does not apply to the case at bar because its "CUTPA claim does not depend upon on allegations [*sic*] of the purchase and sale of securities." Opp. [Doc. 31], at 16. Therefore, the issue before the Court is clear: if Plaintiff's investments with Jeffrey are "securities," its CUTPA claim must be dismissed.

The principle that CUTPA does not apply to the purchase and sale of securities stems from the Connecticut legislature's intent that CUSA be the sole statutory framework for the regulation of securities. *See Russell v. Dean Witter Reynolds, Inc.*, 200 Conn. 172, 180-83 (1986). The Court therefore turns to CUSA and its coverage to determine if Plaintiff's claims fit within its framework.

In relevant part, CUSA § 36b-3(19) defines a "Security" as including an "investment contract," which is not itself defined in the statute. Where CUSA is silent, Connecticut courts are guided by interpretations of the federal Securities Act of 1933 (the "1933 Act"), specifically when interpreting provisions of the 1933 Act that are similar to those in CUSA.[7] *See Capri v. Murphy*, 856 F.2d 473, 479 (2d Cir. 1988) ("[t]he language of [CUSA] § 36-498(a) is virtually identical to the language of section 12(2) [of the 1933 Act] and, in the absence of state authority to the contrary, will be interpreted similarly").

The Supreme Court has consistently held that an investment is an "investment contract" for purposes of the definition of "Security" in the 1933 Act when "'the scheme involves an investment

---

[7]  The definitions of "Security" in the CUSA and the 1933 Act are nearly identical for relevant purposes. *Compare* C.G.S. § 36b-3(19) *with* 15 U.S.C. § 77b(a)(1).

of money in a common enterprise with profits to come solely from the efforts of others.'" *S.E.C. v. Edwards*, 540 U.S. 389, 393 (2004) (*quoting S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 299-301 (1946)).  "This definition embodies a flexible, rather than a static, principle that is capable of adaptation to meet the countless and variable schemes devised by those seeking to use others' money on the promise of profits." *Id.*; *see also Jarozewski v. Gamble*, 2013 WL 5496535, at *4 (Conn.Super. Sept. 12, 2013) (relying on, *inter alia*, the *W.J. Howey* test to determine if plaintiff's investment was an "investment contract" under CUSA).

Here, it is not disputable that any profits that Plaintiff would have received from its investments would have "come solely from the efforts of others," namely, Jeffrey.  Plaintiff makes no allegations that it had any substantive role—managerial, advisory, or otherwise—in AS&T or Southern Cross, that it had any control over the distribution of its investments, or that it even had any knowledge or experience as to the shipping industry in order to contribute to the profit-making enterprise.  *See, e.g., Automated Teller Machine Advantage LLC v. Moore*, 2009 WL 2431513, at *4 (S.D.N.Y. Aug. 6, 2009) (analyzing cases and finding factors relevant to sufficient control to obviate the "solely from the efforts of others test" to be whether investor could appoint board members, remove managers, access investment information, or dissolve the company).  Plaintiff was the archetype of the "mere passive investor," whose investments are governed by the securities laws as a matter of course.  *Wieboldt v. Metz*, 355 F. Supp. 255, 257 (S.D.N.Y. 1973) ("the profit-making potential of the investment was realizable only by the promoters or by third parties who, unlike the purchasers, were in a position effectively to control the operation of the enterprise").  Therefore, Plaintiff's investments with Jeffrey were "investment contracts" and thus "securities" as defined by

CUSA[8]—its CUTPA claim arising out of those investments must be dismissed.[9]

### C.     Count VI (Conversion) and Count VII (Unjust Enrichment)

Defendant moves to dismiss Plaintiff's conversion claim on the sole basis that Plaintiff's complaint does not give "any indication of when the alleged conversion occurred," and that therefore "Plaintiff has not alleged, as required, sufficient facts to show that the applicable statute of limitations is satisfied."  Br. [Doc. 26-1], at 10 (citing *Raucci v. Roman*, 2007 WL 3054950 (D. Conn. Oct. 18, 2007)).  Similarly, Defendant's sole argument that Plaintiff's unjust enrichment claim must be dismissed is that it "fails to give notice of when the 'misappropriating' and 'dissipating' of funds occurred, making it impossible to determine whether the statute of limitations is satisfied." *Id.* at 11.  Defendant's argument fails for the following reasons.

*First*, Defendant is wrong as a factual matter, at least in part.  Plaintiff alleges that it made investments with Jeffrey on April 24, 2008, May 11, 2009, June 19, 2009, Fall 2009, June 14, 2010, and December 2011.  As a matter of course, Jeffrey cannot have converted, misappropriated, or dissipated particular sums of Plaintiff's money prior to the date Plaintiff gave that money to Jeffrey.

---

[8]  Plaintiff argues that its investments cannot relate to "securities" because the entities for which it purchased a supposed security interest were "utterly and completely fictitious."  Opp. [Doc. 31], at 16.  However, CUSA's definition of "security" does not turn on that question; rather, as relevant here, it turns on the question discussed in text, namely, whether Plaintiff's investments (which were real and not fictitious) constitute "investment contracts."

[9]  Plaintiff also argues that its investments are membership interests in limited liability companies ("LLCs"), which are not "securities" under CUSA.  Opp. [Doc. 31], at 16.  There is support for the position that membership interests in LLCs are not securities as defined by CUSA. *McCann v. Screnci*, 2003 WL 22905100, at *1 (Conn.Super. Nov. 26, 2003).  However, Plaintiff's complaint alleges no facts showing that its investments with Defendant constituted membership interests in LLCs.  For example, the Complaint nowhere alleges that the Plaintiff satisfied the requirements of Connecticut General Statutes § 34-179 governing the admission of members into Connecticut LLCs.  Moreover, Plaintiff never even conclusorily claims that either party, including itself, ever contemplated "membership" in either of the entities created by Jeffrey.

Plaintiff brought the instant action on November 21, 2014, and there can therefore be  no question that Plaintiff brought its action as to the December 2011 investment within the three-year statutory limitations period for conversion,[10] codified at Connecticut General Statutes § 52-577.  Similarly, the statute of limitations for an unjust enrichment claim, which "is generally held to be six years,"[11] *Corbett v. Petrillo*, 2008 WL 726373, at *4 (Conn.Super. Feb. 29, 2008), can only possibly bar Plaintiff's initial April 24, 2008 investment.   Therefore, Plaintiff has pled facts affirmatively demonstrating that its claims for conversion and unjust enrichment, are timely, at least in part.

*Second*, and more fundamentally, by claiming that a plaintiff carries a burden to plead definitive compliance with a limitations period (*i.e.*, by arguing that failure to do so means that the claim is "inadequately pled"), Defendant misstates the legal standard for the review of the statute of limitations defense at the motion to dismiss stage.  In fact, it gets it mostly backwards.  The "statute of limitations is an affirmative defense, and therefore generally not appropriate for a motion to dismiss." *Healthcare Strategies, Inc. v. ING Life Ins. & Annuity Co.*, 2012 WL 162361, at *3 (D. Conn. Jan. 19, 2012).  In *Healthcare Strategies*, now-Chief Judge Hall held that:

> the Complaint does not allege sufficient facts to determine whether any or all of the claims are time-barred, nor does it allege facts showing that any or all of the claims are time-barred.  Where, as here,

---

[10]  Defendant argues that the statute of limitations should be measured from Plaintiff's Amended Complaint, filed on February 10, 2012.  *See* Br. [Doc. 26-1], at 6.  This is a disingenuous argument.  It is elementary that an amended complaint relates back to the initial complaint for purposes of the statute of limitations where, as here, it arises "from the same single group of facts as the initial complaint."  *Saphir v. Neustadt*, 177 Conn. 191, 208-09 (1979).

[11]  As an equitable cause of action, an unjust enrichment claim is not technically bound by *any* statute of limitations, even though some courts will apply statutes of limitations by analogy, and sometimes will borrow the three-year tort limitations period of Section 52-577, rather than the six-year contract limitations period of Section 52-576(a).  *See, e.g.*, *Rossman v. Morasco*, 115 Conn.App. 234, 256-57 (Conn.App. 2009).  Nevertheless, as discussed in text, even were the Court to apply Section 52-577, it would not entirely eliminate Plaintiff's claims.

> a complaint does not demonstrate facial infirmity with respect to the
> statute of limitations, a *motion to dismiss on this ground must fail*.

*Id.* (emphasis added).  In short, a motion to dismiss may be granted if a complaint's allegations

affirmatively establish an action's untimeliness, but it may not be granted simply because a

complaint failed to include allegations affirmatively establishing its timeliness.

    *Raucci v. Roman*, relied on by Defendant, is inapposite.  There, the plaintiff brought causes

of action sounding in tort, contract, and under CUTPA in relation to an allegedly fraudulent

transaction.  That transaction occurred eleven years prior to the filing of the lawsuit, and, as the

Court held, any actionable tortious "statements must have been made by the time plaintiff and

defendant executed the transaction."  2007 WL 3054950, at *2.  That being the case,  the plaintiff's

complaint demonstrated on its face that its tort claims were presumptively time-barred, even though

the plaintiff did "not specify when those statements occurred."   Assessment of the statute of

limitations defense at the pleading stage was therefore proper.  *See Ghartey v. St. John's Queens

Hosp.*, 869 F.2d 160, 162 (2d Cir. 1989) ("[w]here the dates in a complaint show that an action is

barred by a statute of limitations, a defendant may raise the affirmative defense in a pre-answer

motion to dismiss").  Here, unlike much of its fraud claim (as discussed *infra*), Plaintiff's conversion

and unjust enrichment claims are not, on their face, time-barred.  As Plaintiff argues, it is unclear at

which dates those claims became actionable.  Plaintiff argues that those dates can only be revealed

by information in the control of Defendant, which will come out in the discovery process.  It is for

this reason, as the above authority elucidates, that the timeliness of a plaintiff's claim is not generally

litigated at the motion to dismiss stage, *Raucci* notwithstanding.[12]

---

[12]  Defendant also cites the statement from *Mills v. Polar Molecular Corp.*, 12 F.3d 1170,
1175 (2d Cir. 1993) that a "complaint must . . . state . . . when the [allegedly fraudulent]

In contrast to the case at bar, the *Raucci* plaintiff's claims accrued on a date-certain that was identifiable from the complaint, and therefore the plaintiff was required to have pled facts that could overcome that overt facial infirmity.  It did so by trying to argue that its claims were tolled under the doctrine of fraudulent concealment, an argument that the court dismissed (without prejudice and with leave to replead), relying, in part, on the fact that the plaintiff "fail[ed] to specify when the [fraudulent] statements occurred." 2007 WL 3054950, at *2.  That holding, however, was expressly reliant on the fact that such allegations, sounding in fraud, must have been pled with particularity under Rule 9 of the Federal Rules of Civil Procedure.  It is irrelevant here as to whether Plaintiff's conversion and unjust enrichment claims were adequately pled.[13]  Moreover, the court held that the relevant facts demonstrating whether the defendant concealed the cause of action "are within the province of plaintiff's knowledge and the lack of discovery does not excuse compliance with Rule 9's specificity requirement." *Id.* at *3.  As discussed, Plaintiff is in no position to have information as to when Jeffrey actually converted, misappropriated, or dissipated his money, facts which must ultimately be determined through discovery.  *Raucci* provides no support for Defendant's motion as

---

statements were made," in further support of his position that a plaintiff must "allege sufficient facts such [*sic*] that show that the applicable statute of limitations is satisfied." Br. [Doc. 26-1], at 4-5.  In *Mills*, however, the Court of Appeals was simply stating what is required to meet the particularity requirement for allegations of fraud under Fed. R. Civ. P. Rule 9(b)—it was not stating (or implying), that Rule 9(b)'s particularity requirement requires a plaintiff to allege satisfaction with a statute of limitations.

[13]  However, as discussed *infra*, it will be relevant to the claims for which Plaintiff will have to establish compliance with the fraudulent concealment doctrine for its claims to be actionable.  Here, the Court is only finding that Plaintiff's conversion and unjust enrichment claims are adequately pled because, not being facially time-barred, Plaintiff was not required to affirmatively plead compliance with the statute of limitations as to those claims.  If discovery demonstrates that, for example, Defendant converted Plaintiff's funds more than three years prior to Plaintiff's filing of the Complaint, the Plaintiff will be required to establish compliance with a tolling doctrine.

to Plaintiff's conversion and unjust enrichment claims.  The motion to dismiss those claims is denied.

## IV.   Whether Plaintiff's Claims are Time-Barred

Plaintiff filed its initial complaint in this action on November 21, 2014.  Defendant argues

that Plaintiff's claims for Fraud (Count I), Civil Theft (Count II), Breach of Contract (Count III),

CUTPA (Count IV),[14] and CUSA (Count V) are all barred by the applicable statutes of limitations

(or, as to CUSA, the statute of repose).  As to each, Plaintiff responds that its claims are either timely

on their face, or, if not, are timely because the running of the relevant limitations period was tolled.

At the outset, the Court addresses the general principles of the tolling doctrines invoked by the

Plaintiff, and then addresses each individual cause of action.

### A.   Tolling Doctrines

Generally, statutes of limitations in Connecticut are "occurrence" statutes, in which "the

limitations period typically begins to run as of the date the complained of conduct occurs, and not

the date when the plaintiff first discovers his injury." *Flannery v. Singer Asset Finance Co., LLC*,

312 Conn. 286, 311 (2014).  This is done, in part, to "prevent the unexpected enforcement of stale

and fraudulent claims." *Watts v. Chittenden*, 301 Conn. 575, 602 (2011).  However, overemphasis

on this concern can lead to unfair results when, for example, a defendant has engaged in conduct

subsequent to the complained of conduct that served to limit the plaintiff's ability to learn of his

cause of action.  Doctrines have developed—both at common law and by statute—to alleviate certain

of such unfairness by creating exceptions to the "occurrence" rule.  Plaintiff at bar invokes two

exceptions: (a) the doctrine of "fraudulent concealment"; and (b) the doctrine of "continuing course

---

[14]   The Court will not address the timeliness of Plaintiff's CUTPA claim because the Court is dismissing that cause of action on the grounds discussed *supra*.

of conduct." The Court addresses these in turn, and then addresses the timeliness of Plaintiff's causes of action.

### 1.    Fraudulent Concealment

Plaintiff argues that its claims did not accrue at the occurrence of Jeffrey's initial conduct because Jeffrey engaged in subsequent conduct that aimed to, and did, prevent Plaintiff from discovering its causes of action. In so doing, Plaintiff posits that Connecticut law recognizes two fraudulent concealment doctrines—that of the common law and that of statutory law—and that both are satisfied in this case. As the separate doctrines Plaintiff proffers carry distinctions that could prove significant, and it is necessary to address that subject.

As to common law, Plaintiff posits that the statute of limitations is tolled where:

> (1) the defendant wrongfully concealed material facts relating to defendant's wrongdoing; (2) the concealment prevented plaintiff's discovery of the nature of the claim within the limitations period; and (3) plaintiff exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled.

Opp. [Doc. 31], at 7 (citing *Corcoran v. N.Y. Power Auth.*, 202 F.3d 530, 543 (2d Cir. 2011)).

As to statutory law, Plaintiff argues that its claims are also tolled by Connecticut General Statutes § 52-595, which provides that:

> If any person, liable to an action by another, fraudulently conceals from him the existence of the cause of such action, such cause of action shall be deemed to accrue against such person so liable therefor at the time when the person entitled to sue thereon first discovers its existence.[15]

---

[15] This rule has a long history in Connecticut. It originally controlled in courts of equity. *See Phalen v. Clark*, 19 Conn. 433, 433-35 (1849) (holding that a defendant is "deprive[d] of the aid of the statute [of limitations]," where "by his own fraudulent acts and representations, has allayed all reasonable suspicion of his original fraud, and thus attempted to obtain an unconscientious advantage, by lapse of time"). It was then codified by the legislature in 1874 in

Connecticut courts interpreting Section 52-595 have established that statute's own three-part test, which is that the party alleged to have fraudulently concealed a cause of action:

> (1) had actual awareness, rather than imputed knowledge, of the facts necessary to establish the plaintiffs' cause of action; (2) intentionally concealed these facts from the plaintiffs; and (3) concealed the facts for the purpose of obtaining delay on the plaintiffs' part in filing a complaint on their cause of action.

*Falls Church Grp., Ltd. v. Tyler, Cooper and Alcorn, LLP*, 281 Conn. 84, 105 (2007).

There are at least two major distinctions in the required elements of the common law (as proffered by Plaintiff) and statutory versions of the fraudulent concealment doctrines. *First*, the statutory version incorporates an intent requirement, namely that the party engaging in fraudulent concealment had "the purpose of obtaining delay on the plaintiffs' part in filing a complaint." *Id.* *Second*, the common law expressly requires that the plaintiff have exercised due diligence in discovering its cause of action.[16]

This Court has found no authority that expressly delineates the interaction, if any, between a Connecticut common law fraudulent concealment doctrine and Section 52-595. However, the Court finds no support for Plaintiff's position that Connecticut recognizes the two as distinct doctrines and that a party is free to rely on one to the exclusion of the other.[17]  Moreover, and as

---

substantially similar form to the modern version.  General Statutes of the State of Connecticut, Chapter XVIII § 20.

[16]  In *Connell v. Colwell*, 214 Conn. 242, 252 n.8 (1990), the Connecticut Supreme Court expressly left open the question whether a party aiming to take advantage of tolling under Section 52-595 must demonstrate its due diligence in pursuing discovery of its cause of action.  It has yet to come back to that question.

[17]  The Court finds only tangential support, such as dicta in *Leon v. Plotkin, McLoughlin & Kosowsky*, in which the court held that a "showing of fraudulent concealment of a cause of

discussed further below, the weight of authority in Connecticut establishes that any party aiming to toll the statute of limitations must adhere to the statutory provisions of Section 52-595.

We start with Plaintiff's invocation of what it terms the "[c]ommon law fraudulent concealment" doctrine, detailed above. Plaintiff's only citations for this doctrine are to *Corcoran v. N.Y. Power Authority*, 202 F.3d 530 (2d Cir. 1999) and *Milo v. Galante*, 2011 WL 1214769 (D. Conn. Mar. 28, 2011). Neither is on point. In *Corocan*, prior to outlining the three-part common law test proffered by Plaintiff, the court held that New York law—controlling in that case—supplied the tolling provisions on which the court was obliged to rely. The Second Circuit then held, in dicta, that "if the federal rule of equitable tolling [were to] appl[y], [plaintiff's] claim would still be time-barred," and only then did it outline the test proffered by Plaintiff here. 202 F.2d at 543. The court made it clear that this is the rule "[u]nder *federal* common law" (words auspiciously absent from Plaintiff's brief). *Id.* (emphasis added). In *Milo*, the court quoted *Corcoran*'s dicta enunciating the federal common law standard when it was evaluating the statute of limitations for plaintiff's civil RICO claims, causes of action brought pursuant to federal law. 2011 WL 1214769 , at *5. As they both were applying federal common law, neither case is relevant here—Plaintiff brings no federal claims and "[i]n diversity cases, state statutes of limitations govern the timeliness of state law claims, and state law determines the related questions of what events serve to commence an action and to toll the statute of limitations." *Pricaspian Dev. Corp. (Texas) v. Royal Dutch Shell, PLC*, 382 F. App'x 100, 102 (2d Cir. 2010) (internal quotation marks omitted).

That those courts were assessing the federal common law is significant not only because it

---

action, *either at common law or under General Statutes Section 52-595* tolls the statute of limitations. 1993 WL 28755, at *1 (Conn.Super. Jan. 26, 1993) (emphasis added).

demonstrates that Plaintiff has not proffered a *Connecticut* common law fraudulent concealment doctrine, but also because Connecticut statutory law expressly diverges from its federal common law counterpart.  Specifically,

> Connecticut's tolling statute, Conn.Gen.Stat. § 52-595, *is more exacting than the federal equitable tolling doctrine*. . . .  Under Connecticut law, a plaintiff seeking to toll a statute of limitations on the basis of fraudulent concealment must show that defendant's conduct or representations *were directed to the very point of inducing delay in the bringing of the lawsuit* to a time which the defendant thereafter claims bars the action as not brought within the statute of limitations.  *Lippit v. Ashley*, 89 Conn. 451, 94 A. 995 (1915).

*Danmar Ass. v. Porter*, 43 B.R. 423, 429 (D. Conn. 1984) (emphasis added).  Other Connecticut courts have likewise held that the rule identified in *Lippit*—that the "very point" of the concealment must be to delay filing of a lawsuit—is a required element of *any* fraudulent concealment claim brought under Connecticut law.  For example, in *Kivlen v. Town of Fairfield*, the Connecticut Superior Court held that:

> Fraudulent concealment of a cause of action *at common law and under section 52-595* . . . [require that the] defendant's actions must have been directed to the very point of obtaining the delay in filing the action which the defendant later seeks to take advantage of by pleading the statute of limitations.

1992 WL 157386, at *4 (Conn.Super. June 25, 1992) (emphasis added); *see also Consoli v. Clarke*, 1996 WL 737483, at *1 (Conn.Super. Dec. 10, 1996) ("under Connecticut law, application of the doctrine of equitable estoppel is restricted to conduct of representations which were 'directed to the very point of obtaining the delay, of which [the party to be estopped] afterward seeks to take advantage by pleading the statute" (internal quotation marks omitted)).[18]

_____

[18]   Other courts faced with a party purporting to bring both a common law and statutory fraudulent concealment claim have also applied Section 52-595's requirement that an intent of

Further, to the extent there is, or ever has been, an independently operative state common law fraudulent concealment doctrine in Connecticut, the legislature superceded it through passage of Section 52-595.  *See Pinter v. Henry J. Showah, DDS, P.C.*, 2010 WL 4276743, at *2 (Conn.Super. Sept. 23, 2010) (Section 52-595 "is the codification of the common-law rule that fraudulent concealment is an avoidance of an affirmative defense of the statute of limitations"); *see also Brown v. Otake*, 2011 WL 5223129, at *4 (Conn.Super. Oct. 4, 2011) (same); *Schifano v. Bank of New York Co.*, 2013 WL 1715731, at *4 (Conn.Super. Apr. 1, 2013) (same).[19]

Here, Section 52-595 expressly departs from the common law doctrine proffered by Plaintiff, and, as the above-cited cases demonstrate, has been interpreted as such for a significant time in Connecticut.  It therefore seems clear that any plaintiff rebutting a statute of limitations defense on the grounds that the defendant fraudulently concealed its cause of action must satisfy the

---

the concealment be delaying the filing of a complaint.  *See Rosado v. Bridgeport Roman Catholic Diocese Corp.*, 1997 WL 585779, at *2 (Conn.Super. Sept. 15, 1997); *J.F.C. Endeavors, Inc. v. Pioneer Steel Ball Co.*, 1999 WL 1314937, at *7 (Conn.Super. Dec. 14, 1999); *Dolnack v. Metro-North Commuter R.R. Co.*, 1993 WL 11949, at *3 (Conn.Super. Jan. 19, 1993), *rev'd on irrelevant grounds*, 33 Conn.App. 832 (Conn.App. 1994).

[19]   That the Connecticut legislature abrogated the common-law fraudulent concealment doctrine (to the extent it existed) through Section 52-595 is further supported by analogous guidance from the Connecticut Supreme Court.  In *Location Realty, Inc. v. Colaccino*, the Court was faced with determining whether "the legislature intended to preserve the common-law equitable remedy of unjust enrichment when it enacted" Connecticut General Statutes § 20-325a(d), a section that makes no express reference to any equitable remedies.  287 Conn. 706, 723 (2008).  The Court held that the legislature did not, because:

> [S]ubsection (d) was enacted, at least in part, to deal with the precise equitable concerns at issue in claims of unjust enrichment.  Put differently, by addressing the unjust enrichment problems with a statutory remedy . . . we conclude that the legislature declined to leave intact a common-law remedy to parties in these circumstances.

*Id.* at 730.

-26-

requirements of Section 52-595 and the cases interpreting it.  The Court therefore holds that Plaintiff's claims may not be tolled under a common law doctrine of fraudulent concealment, and must be viewed only in light of the requirements of Section 52-595.  Plaintiff's fraudulent concealment claim will only counter Defendant's statute of limitations defense if it meets the standard for Section 52-595 discussed above, including its requirement that Plaintiff establish that Defendant specifically intended to delay Plaintiff's filing of the instant suit.  Whether Plaintiff has met that burden at this stage of the litigation will be discussed below.

### 2.    Continuing Course of Conduct

Plaintiff also argues that its causes of action are tolled pursuant to the principle that "[w]hen [a] wrong sued upon consists of a continuing course of conduct, the statute [of limitations] does not begin to run until that course of conduct is completed."  *Giulietti v. Giulietti*, 65 Conn.App. 813, 833 (Conn.App. 2001) (*quoting Handler v. Remington Arms Co.*, 144 Conn. 316, 321 (1957)).

A brief look at the origin and purpose of the continuing course of conduct doctrine, however, demonstrates its inapplicability to the case at bar.  The doctrine "reflects the policy that, during an ongoing relationship, lawsuits are premature because specific tortious acts or omissions may be difficult to identify and may yet be remedied."  *Martinelli v. Fusi*, 290 Conn. 347, 356 (2009).  It is no surprise then that the doctrine generally arises in claims sounding in negligence, and "is most commonly used in an attempt to avoid a statute of limitations defense in medical malpractice actions."  *State v. Ayala*, 154 Conn.App. 631, 646 n.20 (Conn.App. 2015); *see also Watts v. Chittenden*, 301 Conn. 575, 583-84 (2011).  The doctrine applies in such cases because "it is almost impossible to pinpoint the specific moment when enough conduct has occurred to become actionable."  *Watts*, 301 Conn. at 597 n.4.

-27-

Although the doctrine is not limited to cases sounding in negligence,[20] the Connecticut Supreme Court has made clear that there exists only a limited type of suits to which the doctrine is available.  It did so by relying on an explication by Seventh Circuit Chief Judge Posner.  Judge Posner contrasted situations "in which repeated events give rise to discrete injuries," such as a suit for lost wages, with cases in which "a single event gives rise to continuing injuries [or] the case in which a continuous series of events gives rise to a cumulative injury."  *Watts*, 301 Conn. at 588 (quoting *Heard v. Sheahan*, 253 F.3d 316, 320 (7th Cir. 2001)).  Posner then concluded that in the latter situations (*i.e.*, a prisoner suing for denial of medical care), tolling may be available, but in the former (*i.e.*, lost wages), it cannot be.  Specifically, he said that:

> If our plaintiff were seeking backpay for repeated acts of wage discrimination (suppose that every pay day for five years he had received $100 less than he was entitled to), he would not be permitted to reach back to the first by suing within the limitations period for the last. . . . *[T]he damages from each discrete act of discrimination would be readily calculable without waiting for the entire series of acts to end.  There would be no excuse for the delay.  And so the violation would not be deemed "continuing."*

*Id.* (quoting *Heard*, 253 F.3d at 320)) (emphasis added).  As with the case for lost wages, Plaintiff's "damages arising from the defendant's alleged breaches were readily calculable and actionable at the time of breach, unlike those cases where it is the cumulative effect of the defendant's behavior that gives rise to the injury."  *Fradianni v. Protective Life Ins. Co.*, 145 Conn.App. 90, 100 (Conn.App. 2013).  Specifically, Plaintiff identifies six discrete and independent injuries that are entirely calculable to precise monetary figures, and were nearly all alleged to occur on dates certain.  *See*

---

[20]  In *Watts*, the Connecticut Supreme Court held that the continuing course of conduct doctrine is not limited to cases in which the defendant owed a duty to the plaintiff with respect to the originally wrongful conduct.  301 Conn. 575 (holding that plaintiff may use the doctrine to toll a claim for intentional infliction of emotional distress)

*supra* p. 5.  If Plaintiff's allegations are true, its claims were actionable on those dates certain.[21]  In

short, Plaintiff has "alleged a series of repeated breaches over a period of years.  Accordingly, the

continuing course of conduct doctrine is inapplicable to the present case."  *Id.*

### B.        Timeliness of Plaintiff's Claims

#### 1.        Count I (Fraud)

The statute of limitations for a fraud claim is three years, which runs "from the date of the

act or omission complained of."  Connecticut General Statutes § 52-577.  Where a plaintiff can

demonstrate that its claims were tolled due to defendant's fraudulent concealment, the three-year

limitations period instead runs from the time when the plaintiff first discovers the existence of its

cause of action.  Connecticut General Statutes § 52-595.

At the outset, the Court holds that Plaintiff's fraud claim as to its December 2011 investment

is timely without reference to a tolling doctrine.  Plaintiff specifically alleges that its final investment

of $100,000 was based on Defendant's December 2011 "misrepresentation to Doug Mueller . . .

about the use of the investment going to serve the initial purposes of AS&T and that the venture

remained profitable."  Am. Compl. [Doc. 17], ¶21.  This misrepresentation was alleged to have been

made within three years of the filing of Plaintiff's initial complaint.

However, the remainder of Plaintiff's fraud claim relates to fraudulent acts that were alleged

to have occurred more than three years prior to Plaintiff's filing of a complaint.  These claims are

facially untimely.  In line with the principles discussed above, those claims may only survive

---

[21]  Plaintiff's fraudulent concealment argument—that Defendant hid the facts required for it to know that its claims were actionable—is irrelevant as to the continuing course of conduct doctrine.  Here we see with clarity the distinction between the two tolling doctrines.  Continuing course of conduct tolls the limitations period until plaintiff's claims *actually* became actionable. Fraudulent concealment tolls the limitations until *plaintiff knew* its claims were actionable.

dismissal if Plaintiff sufficiently alleged compliance with Section 52-595.

To briefly recap and expand as to the requirements of Section 52-595, Plaintiff's fraud claims were tolled until he actually discovered Defendant's fraud if it can prove that Defendant: (1) knew of the facts constituting his fraud; (2) intentionally concealed those facts from Plaintiff; and (3) did so specifically to delay Plaintiff's filing of a civil complaint. Moreover, under Section 52-595, Plaintiff must prove concealment of the cause of action by "clear, precise, and unequivocal evidence." *Id.* Nevertheless, Plaintiff may rely on circumstantial or inferential evidence to establish its claim, specifically regarding whether Defendant's actions were aimed at delaying its filing of a complaint. *See Fenn v. Yale Univ.*, 283 F.Supp.2d 615, 637 (D. Conn. 2003) (citing, *inter alia*, *Puro v. Henry*, 188 Conn. 301, 310 (1982)); *see also Falls Church*, 2003 WL 22905155, at *13 (circumstantial evidence can be used to meet all three prongs of the Section 52-595 test).

Further, Plaintiff's "[a]llegations of fraudulent concealment [pursuant to Section 52-595], like allegations of fraud, must satisfy the pleading requirements of Rule 9(b)," *Breiner v. Stone*, 1997 WL 416942, at *1 (2d Cir. July 25, 1997), and thus Plaintiff must have "state[d] with particularity the circumstances constituting [the] fraud," Fed. R. Civ. P. 9(b). The Second Circuit has recently reiterated what is required to meet the particularity requirements of Rule 9(b): the plaintiff must "'(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent.'" *Financial Guar. Ins. Co. v. Putnam Advisory Co.*, 783 F.3d 395, 403 (2d Cir. 2015) (quoting *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004)). However, Rule 9(b) allows that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

At the outset, the Court makes two observations. *First*, Defendant does not argue that Plaintiff has failed to plead with particularity most of the statements that Plaintiff relies on to establish that its claims were tolled. Rather, Defendant only argues that Plaintiff failed to plead with particularity statements made subsequent to February 10, 2012.[22] Br. [Doc. 26-1], at 8. *Second*, Plaintiff may not rely on alleged misrepresentations that occurred prior to its initial investment as the basis for invoking the tolling doctrine of Section 52-595. Defendant's fraud was not complete (if it ever was) until Plaintiff proffered funds to Defendants. Misrepresentations made previous to the completion of the fraud—including the March 2008 PPM and April 2008 SPA—constitute the core misrepresentations that form Plaintiff's fraud claim. In short, one generally cannot fraudulently conceal an unconsummated fraud. To hold otherwise would place all claims of common law fraud under the umbrella of Section 52-595, an outcome surely at odds with Section 52-577.

The issue then becomes whether Plaintiff has pled with particularity any fraudulent statements made *after* its initial investment that served to, and did, conceal the fraudulent nature of the misrepresentations that Defendant made prior to and concurrent with that initial investment.[23]

The Court begins with the May 10, 2009 letter that Defendant allegedly provided to Plaintiff,

---

[22] It is true that Plaintiff only raised its fraudulent concealment tolling argument in opposition to Defendant's motion to dismiss. However, Defendant was provided an opportunity to file a reply brief, in which it could have argued that Plaintiff has failed to plead with particularity the fraudulent statements that it claims concealed its fraud cause of action. He chose not to do so.

[23] One could argue (as Defendant has not) that Plaintiff is required to show that its fraud cause of action was fraudulently concealed *as to each specific investment*, which would require particular allegations following each investment. For purposes of tolling, an equitable doctrine, however, the Court is persuaded by Plaintiff's argument that Defendant's alleged conduct should be viewed as "a series of actions that constitute a single alleged enterprise created and perpetrated by Jeffrey, using two fraudulent entities as the means of deceiving his various investors (including plaintiff) over a five year period[]." Opp. [Doc. 31], at 7.

in which Defendant asserted that AS&T had made $1.8 million in profits and that he was reinvesting

those funds.  Plaintiff contends that Defendant wrote this letter as part of a scheme in which he

> simply renewed his misrepresentations as to his purpose and added
> new details about the positive performance of the fund.  These new
> misstatements of fact were made not only to defraud and mislead
> Slainte Investments and other investors into giving him even more
> money but to assure through additional acts of frauds that he
> concealed the fact that the original investment was now appropriated
> to the defendant's ongoing criminal enterprise.

Am. Compl. [Doc. 17], ¶18.  Further, Plaintiff also alleges the following: (I) that between 2009-

2013, "Mr. Mueller regularly communicated with Jeffrey in phone and in person and each time

Jeffrey assured Mr. Mueller that his investments were safe and profitable," *id.* ¶19;  (ii) that in

December 2011, Jeffrey contacted Mueller and "made similar misrepresentations to Doug Mueller

as he had on previous occasions about the use of the investment going to serve the initial purposes

of AS&T and that the venture remained profitable," *id.* ¶21; (iii) in 2012, after being pressured by

Mueller to make a distribution, Jeffrey "offered assurances that the two companies would be making

some kind of distribution in the near future," including statements regarding certain "port projects"

that were tying up Plaintiff's funds, *id.* ¶¶29-30; (iv) in 2014, Jeffrey "claimed to Mueller that the

funds were tied up in various transactions and that he was about to close a deal in Western Canada

that would generate funds to pay off investors," *id.* ¶32; and (v) in 2013, Jeffrey "paid [] off" an

investor who discovered the fraud "in exchange for an agreement not to share the information with

anyone," *id.* ¶23.

In light of the above, Plaintiff has satisfied the first two elements of Section 52-595, that

Defendant knew of the facts constituting his fraud and that he intentionally concealed those facts

from Plaintiff.  Moreover, Plaintiff has pled those facts with sufficient particularity.  There can be

no dispute that he did so with respect to the May 10, 2009 letter.  That Plaintiff does not identify with precision the dates on which the other actions allegedly constituting fraudulent concealment took place is not fatal.  The cornerstone of Rule 9(b)'s specificity requirement is that a defendant be provided "with fair notice of a plaintiff's claim and adequate information to frame a response." *U.S. ex rel. Tiesinga v. Dianon Sys., Inc.*, 231 F.R.D. 122, 123 (D. Conn. 2005); *see also O'Brien v. Nat'l Property Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991) ("The purpose of Rule 9(b) is threefold—it is designed to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from 'improvident charges of wrongdoing,' and to protect a defendant against the institution of a strike suit.").  That being the case, "'dates, times and places need not be pleaded with absolute precision, so long as the allegations sufficiently put the defendant on notice as to the circumstances of the charged misrepresentations.'" *In re U.S. Foodserve Inc. Pricing Litig.*, 2009 WL 5064468, at *18 (D. Conn. Dec. 15, 2009) (quoting *Harris v. Wells*, 757 F. Supp. 171, 174 (D. Conn. 1991)).  Moreover, "'courts have relaxed Rule 9(b)'s heightened pleading requirements in cases involving complex fraudulent schemes or those occurring over a lengthy period of time and involving thousands of billing documents.'" *Id.* (quoting *Tiesinga*, 231 F.R.D. at 123).  Applying these principles, and in light of the fact that Defendant makes no argument as to the particularity with which these facts were alleged, the Court holds that Plaintiff's allegations of fraudulent concealment were pled with sufficient particularity to survive Defendant's motion to dismiss.

The Court now turns to the third element:  whether Plaintiff has sufficiently alleged that it was Defendant's specific intent in concealing his initial fraud to delay Plaintiff's filing of the complaint in this action.  The Court addresses this element separately because, focused exclusively on Defendant's intent, it "may be alleged generally," Fed. R. Civ. P. 9(b), and may be proved by

circumstantial or inferential evidence.  Perhaps for those reasons, Plaintiff gives this element relatively short shrift in its Amended Complaint, alleging conclusorily that Jeffrey's statements in response to investor questions between 2009-2013 that Plaintiff's investments were safe and profitable "were intentionally made to further conceal the original fraud and to delay the filing of a complaint."  Am. Compl. [Doc. 17], ¶19.  Despite the cursory treatment given to this element, the Court finds Plaintiff's allegations sufficient at this stage.  Rule 9(b) permits states of mind to be pled generally for a reason:  absent discovery, Plaintiff is simply in no position to know *why* his adversary did what he did.  Moreover, it is reasonable to infer, at this stage, that one reason Jeffrey continued to conceal his initial fraud was to keep Plaintiff away from the courthouse pending the expiration of the limitations period.

Accordingly, Plaintiff has sufficiently alleged that its claim for fraud was tolled pursuant to Section 52-595.  Taking Plaintiff's allegations as true, as it must at this stage, the Court holds that the three-year statute of limitations on Plaintiff's fraud claim did not accrue until October 2014, when Plaintiff allegedly discovered Defendant's fraudulent scheme.  That being the case, Plaintiff's alleged fraud claim is timely, and Defendant's motion to dismiss that cause of action is denied.

### 2.    Count II (Civil Theft)

A claim for civil theft is also governed by the three-year limitations period of Connecticut General Statutes § 52-577, and therefore also accrues on the date of the "act or omission complained of."  *See Cooperman*, 289 Conn. at 408.  The act that Plaintiff complains of is larceny,[24] an act which is completed "when, with intent to deprive another of property or to appropriate the same to himself

---

[24]  Plaintiff actually purports to bring its civil theft cause of action under Connecticut General Statutes § 52-564, a statutory section subtitled "Treble damages for theft."

or a third person, [a person] wrongfully takes, obtains or withholds such property from an owner." Connecticut General Statutes § 53a-119.  Specifically, Plaintiff alleges that Defendant committed embezzlement, an act of larceny that occurs "when [a person] wrongfully appropriates to himself or to another property of another in his care or custody." *Id.* § 53a-119(1).  Accordingly, the statute of limitations on Plaintiff's civil theft cause of action expires three years following the date that Defendant appropriated Plaintiff's money for himself.

Defendant can only have appropriated Plaintiff's money for himself after Plaintiff provided said money to Defendant.  Therefore, Plaintiff's claim as to its December 2011 investment, made less then three years prior to the filing of this lawsuit, must be timely.

As to the five other investments, Plaintiff's argument is, as with its conversion claim, that "[w]ithout the aid of discovery Plaintiff cannot allege the specific dates that Defendant misappropriated the funds."  Opp. [Doc. 31], at 13.  Specifically, Plaintiff posits that, without discovery, it cannot ascertain whether AS&T and Southern Cross were wholly fictitious—and thus Plaintiff's investments were embezzled immediately upon transfer of funds—or whether they initially existed in fact and only at some later point did Defendant appropriate the money for himself.  *Id.* at 15.  That analysis is sound, and it follows that Defendant has failed to establish that Plaintiff's cause of action for civil theft is untimely on its face.  The Court need not address, at this stage, whether the limitations period for Plaintiff's civil theft claim was tolled by the doctrine of fraudulent concealment.

For the foregoing reasons, on this record the Defendant's motion to dismiss Plaintiff's civil theft claim is denied.

### 3.      Count III (Breach of Contract)

The statute of limitations for a breach of contract claim is six years, Connecticut General Statutes § 52-576, a period that runs from the date that the breach occurs, *Tolbert v. Connecticut General Life Insurance Co.*, 257 Conn. 118, 124 (2001). Defendant cannot have breached an agreement with Plaintiff prior to Plaintiff performing under the contract, *i.e.*, by paying funds to Defendant. Therefore, any claim as to an investment (*i.e.*, agreement) made after November 21, 2008, six years prior to the filing of the complaint, is timely as a matter of law.

That leaves only Plaintiff's first investment with Defendant, made on April 24, 2008, that is the subject of any plausible timeliness defense. However, as with its conversion and unjust enrichment claims, Plaintiff alleges that, without taking discovery, it cannot identify with specificity the precise dates in which Defendant breached their contracts. Plaintiff alleges that it may have been the case that Defendant's initial operations were legitimate, and only subsequently did he breach the initial agreement. If that be the case, Defendant may not have breached the April 24, 2008 agreement until sometime after November 21, 2008, which would render that claim timely. Accordingly, Defendant has failed to demonstrate that Plaintiff's breach of contract claim is facially untimely, and therefore its motion to dismiss this claim must be denied. The Court need not address, at this stage, whether a breach of contract claim as to the April 24, 2008 investment was tolled.[25]

### 4.      Count V (CUSA)

Connecticut's statute of limitations for securities fraud claims departs from that for common law fraud claims. Whereas common law claims accrue when the fraudulent conduct occurred,

---

[25] As discussed, *supra* note 13, if discovery demonstrates that Defendant breached the agreement related to the April 24, 2008 investment prior to November 21, 2008, Plaintiff will then need to demonstrate that its breach of contract claim as to that investment was tolled.

CUSA's is a hybrid rule, being both an "occurrence" and a "discovery" statute.  Specifically, CUSA provides:

> [W]ith respect to actions arising out of intentional misrepresentation or fraud in the purchase or sale of securities, no person may bring an action more than two years from the date when the misrepresentation or fraud is discovered or in the exercise of reasonable care should have been discovered, except that no such action may be brought more than five years from the date of such misrepresentation or fraud.

Connecticut General Statutes § 36b-29(f).  Accordingly, CUSA's two-year limitations period runs from the discovery of Defendant's fraudulent conduct, but CUSA also imposes a firm five-year period from the occurrence of the fraudulent conduct after which no claims may be brought, typically known as a statute of repose.  Defendant argues that Plaintiff's CUSA claim is entirely barred by this five-year statute of repose.[26]

Defendant argues that the "last instance of misrepresentation or fraud alleged in connection with the purchase or sale of securities is May 2009," the date of the Stock Purchase Agreement and Stockholders Agreement relating to Southern Cross that Defendant transmitted to Plaintiff.  Br. [Doc. 26-1], at 10.  This is wrong.  For example, Plaintiff alleges as follows:

> During the period between the initial investment in 2008 and Slainte's final investment in December 2011, Jeffrey concealed the true circumstances, which was that the money was being used for Jeffrey's personal expenses and not for investment purposes, *by various means*, including but not limited to written documents such as private placement memoranda[27] and subscription agreements that were completely untrue but intended to create a false sense that the

---

[26]  Defendant does not argue that Plaintiff's CUSA claim is barred by CUSA's two-year statute of limitations.

[27]  Note the use of the plural here, indicating that Plaintiff is alleging the subsequent private placement memoranda were sent following the initial PPM relating to AS&T, dated March 19, 2008.

> investments were legitimate for purposes of concealing the fraud;
> verbal and written reports that the investments were not only being
> used for their intended purposes but that they were generating a profit
> and promises that investors would soon see a return on their
> investments also for purposes of concealing the fraud.

Doc. 17, at 11.  Further, Plaintiff alleges that "in December 2011, Jeffrey would again contact Doug

Mueller and solicit him to contribute an additional $100,000 into the fictitious AS&T.  *He made*

*similar misrepresentations to Doug Mueller as he had on previous occasions*."  Doc. 17, at 9

(emphasis added).  Plaintiff has therefore alleged that misrepresentations were continually made up

through its final investment with Jeffrey.

Nonetheless, as a factual matter, investments cannot be induced by post-investment

misrepresentations.  It follows that any claim brought as to an investment that Plaintiff made more

than five years prior to the filing of the initial complaint must be barred by CUSA's statute of repose.

Plaintiff's invocation of tolling doctrines to avoid this reality is misplaced.  Statutes of repose,

unlike statutes of limitation, are firm bars to suit not amenable to equitable tolling.  As recently

explained by the Second Circuit:

> Statutes of limitations limit the availability of remedies and,
> accordingly, may be subject to equitable considerations, such as
> tolling, or a discovery rule. . . .  In contrast, statutes of repose affect
> the underlying right, not just the remedy, and thus they run without
> interruption once the necessary triggering event has occurred, even if
> equitable considerations would warrant tolling or even if the plaintiff
> has not yet, or could not yet have, discovered that she has a cause of
> action.

*Fed. Hous. Fin. Agency v. UBS Americas Inc.*, 712 F.3d 136, 140 (2d Cir. 2013) (internal citations

and quotation marks omitted).

As a statute of repose, CUSA's five-year limitations period is not subject to tolling.  *Miller*

*v. Field*, 1997 WL 693020, at *4 n.4 (Conn.Super. 1997) (CUSA's "five year limitations period is an outside period of repose inconsistent with tolling."). This is because if "CUSA's five-year statute of repose . . . could be tolled due to concealment by the defendant, it would become meaningless, and the timeliness of a claim under CUSA would turn entirely on discovery and the two-year statute of limitations." *Boston Property Exchange Transfer Co. v. Merrill Lynch*, *Pierce, Fenner & Smith, Inc.*, 2012 WL 5476911, at *10 (Conn. Super. Oct. 16, 2012). This is entirely consistent with how federal courts interpret the 1933 Act's analogous three-year statute of repose. *See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 362 (1991) ("Because the purpose of the 3-year limitation is clearly to serve as a cut off, we hold that tolling principles do not apply to that period"); *Police and Fire Ret. System of the City of Detroit v. IndyMac MBS, Inc.*, 721 F.3d 95 (2d. Cir. 2013) (rejecting application of a tolling doctrine as to the 1933 Act's three-year statute of repose because "judges may not deploy equity to avert the negative effects of statutes of repose").

Accordingly, Defendant's motion to dismiss Plaintiff's CUSA claim is granted as to Plaintiff's investments made more than five years prior to November 21, 2014, the filing of the initial complaint. Specifically, CUSA claims as to Plaintiff's April 24, 2008, May 11, 2009, and June 19, 2009 investments are dismissed. On the other hand, Defendant's motion to dismiss Plaintiff's CUSA claims as to the Fall 2009,[28] June 14, 2010, and December 2011 investments is denied.

---

[28] Plaintiff made an investment of $119,500 in AS&T in "Fall 2009," a period which ran from September 22, 2009 through December 20, 2009. This investment may only be the subject of a timely CUSA claim if it was made after November 20, 2009. It being the motion to dismiss stage, the Court will give Plaintiff the opportunity to establish this date through discovery.

**V.      Conclusion**

For the foregoing reasons, Defendant's [Doc. 26] Motion to Dismiss is GRANTED IN PART and DENIED IN PART.  Specifically:

1. Defendant's Motion to Dismiss Counts I, II, VI, and VII of the Amended Complaint is DENIED.

2. Defendant's Motion to Dismiss Count III is GRANTED IN PART and DENIED IN PART.

3. Defendant's Motion to Dismiss Count IV is GRANTED.

4. Defendant's Motion to Dismiss Count V is GRANTED as to Plaintiff's April 24, 2008, May 11, 2009, and June 19, 2009 investments, and DENIED as to Plaintiff's Fall 2009, June 14, 2010, and December 2011 investments.

**It is SO ORDERED.**

**Dated:  New Haven, Connecticut**
**November 3, 2015**


    _/s/ Charles S. Haight, Jr._
**Charles S. Haight, Jr.**
**Senior United States District Judge**